*Exhibit 1 - Explanation of discriminatory actions by NCSU*

6. Why do you believe these actions were discriminatory?

- I believe these actions were discriminatory because I was not treated with the same disciplinary actions as other officers at the department. Other male officers have done this exact action that I am being accused of and we not punished or terminated.

- I believe that Master Officer Kelly discriminated against me in that he did not obtain all necessary facts regarding the allegations against me. Master Officer Kelly alleged that I was untruthful in my account of the incident that occurred on 12/13/2011 and while I was explaining the incident he received a phone call and left in the middle of my conversation. He never clarified any of my comments and came to his own conclusion on what he heard that I told him Det Guy and Sgt. Davis both gave me permission to search a dorm room. That is completely incorrect and a falsification of the facts. I told MO Kelly that Det. Guy told me that I could have searched the room when I smelled the odor of marijuana in the room. ** Master Officer Kelly was the complainant regarding this allegation and he was also the assigned investigator to investigate this allegation **

- I had no communications by my command staff. Sgt. Bentley did not ask me any questions or talk with me. Master Officer Kelly did not give my the opportunity to finish my account of events before coming to his conclusion.

- NCSU Police department did not follow their own policies and procedures when it came to my case. It states very clearly in General Order 200-1 that an Internal Affairs investigation shall be conducted by the Internal Affairs manager ( Tim Johnson) or a contracted outside agent. This was not done in my case, as my case was investigated by the complainant for allegation #2.

- I believe that discrimination has occurred against me based on my sex. Other male officers have committed more serious offenses and were not terminated. Officer Neal Lybarger threatened another female officer and is still working at NCSU. Officer Christopher Brooks was found having sex while on duty and was given the option to resign in lieu of termination. Senior Officer Steven Carlton reported to work

intoxicated and again was given the option to resign in lieu of termination.

- I was never given any opportunity to resign, I was never given any communications on what was going on, I was never told what the complaint was against me or who the complainant was until I was called into the Internal Affairs room on 1/1/2012.

- Master Officer Kelly, who is also the complainant in my case, did not conduct a thorough investigation and never met with any of the witnesses in person.

- I had previously told MO Kelly that I was going to take the promotional exam for Sergeant and MO Kelly made a comment to me that he didn't think that I was qualified.

- MO Kelly did not follow all the rules and procedures in my case.

- MO Kelly is close friends with Sgt. Sutton and other males within the department, but would treat me differently when I spoke with him.

7. What reason(s) were given to you for the acts you consider discriminatory?

- I was told that I was insubordinate.
- I was told that I possibly violated the 4th Amendment to the United States Constitution.
- I was told that I possibly violated NCSU Policies and Procedures.
- I was told that I did not cooperate.
- I was told that I was deceptive, contradictory, and conflicting with my account of events.
- I was told that I was untruthful to the Chief when I was explaining the account of events. I have been accused of lying to the Chief regarding completion of the incident report when I clearly stated that Sgt. Bentley and Master Officer Jeremy Allen were both present when I asked what needed to be in my report before leaving for the night. ** Sgt. Bentley and Master Officer Allen were never interviewed or spoken to about my report **

On 1/1/2012 I was contacted by Master Officer David Kelly to respond to the police station. Upon arrival, M.O Kelly requested that I put my lunch down and follow him. I followed him to Mr. Johnson's office (Internal Affairs office). MO Kelly closed the door and began explaining to me that he needed to finish his conversation with me from 12/16/2011 regarding the Sydney Ellers case and the search of her dorm room. I was immediately shocked and confused since I was under the impression by MO Kelly that the incident on 12/13/2011 was no longer as issue, and after I was told multiple times by MO Kelly that I was NOT under any investigation. After MO Kelly read me my Garrity rights and gave me a copy of the IA policy (which I read over), he began the tape recorder and his questioning.

After requesting why I was there and what policy I violated, ( I had asked this question on 12/16/2011 and was told by MO Kelly that it was none of my business). MO Kelly gave me a piece of paper alleging that I conducted an inappropriate search on 12/13/2011 and alleged that I was untruthful in my explanation to him on 12/16/2011. I was immediately concerned by the second allegation and after reading the "Summary of Incident" paperwork that MO Kelly provided to me, I saw several incorrect accounts and misinterpretations of what I had told and tried to explain to MO Kelly on 12/16/2011.

**Friday 12/16/2011-** Conversation in the Sergeant's Office:

MO Kelly requested that I meet with him. I made contact in person with MO Kelly and was asked to have a seat in the Sergeant's office and MO Kelly shut the door. MO Kelly proceeded to say that he had some items to go over with me and that they were not good. (His demeanor was abrupt and disciplinary) MO Kelly pushed a piece of paper across the table at me and stated, "can you explain this". The way MO Kelly pushed the paper towards me was abrupt and when I looked at him he was not making any eye contact with me. I immediately recognized that the paper was a copy of a property/evidence log in which I had a NCSU facility worker turn in a debit card that he found on the ground. I followed our policy regarding "Found Property" completed the property receipt form and left it at the ECC / Dispatch counter. The dispatcher had previously made contact with me via the radio and advised me that the student would be stopping by later in the day to pick up his debit card. I left the debit card secured in an envelope and the property receipt with the dispatcher and asked her to have the student sign for his card when he arrived. MO Kelly stated that I should not have

$\overset{?}{\text{.}}$ left the debit card at the ECC center and gave me the policy to read. When I attempted to explain my actions and why I had did what I did- I tried to explain that I saw a senior officer with more seniority do this exact thing a week ago and that is why I was leaving the found property at the dispatch counter. I never had the opportunity to finish my sentence, when MO Kelly interrupted me and stated that he didn't care what other officers did and he stated that I should have known better. He then stated the second item was that I was telling victims' that they could get a copy of their police report in 24-48 hours as was originally told to me in my training. He reminded me that this rule has changed and it is now 3-5 business days before they could get a copy of their report. I acknowledged this with MO Kelly and tried to explain that I was trained in FTO (Field Training) that I was to advise 24-48 hours. Before discussing the last item with me, MO Kelly began the conversation with no supervisor likes doing this or having these types of conversations. He then stated that he received a complaint that went through three (3) different people before reaching him. He stated that I conducted an inappropriate search at North Hall and requested that I explain what had happened. Due to MO Kelly's behavior, attitude and demeanor, I was unsure of what actions I had done that I deserved this treatment. I immediately asked MO Kelly if Tim Johnson with Internal Affairs needed to be involved. MO Kelly stated, "no", and assured me that this was not an internal affairs investigation. He stated that he received a complaint and that he was investigating if I had violated Constitutional rights or NCSU policy. I began explaining to MO Kelly the circumstances surrounding that incident, and I do remember that the explanation was not in an order as MO Kelly would interrupt and ask questions. I remember sitting in the office thinking that I was being questioned because I did not search the room after smelling the odor of marijuana upon my initial entry into the dorm room with Asst. Housing director, Andy Petters, and RA, Brooke Bailey. I then began telling MO Kelly that I apologize for not searching the room at that time and explained to MO Kelly that when I had called Det. Guy he had asked me why I had not searched the room at that time. Det. Guy had stated on the phone with me that that was probable cause to search. I explained to Det. Guy that I did not search the room because I was there with housing and that I had started to feel bad- I told this to MO Kelly. I told MO Kelly that I felt I had let Det. Guy down for not searching the room at that time. Det. Guy then had stated to me on the phone that I could now search the room if I made contact with Ms. Ellers again and obtained her consent. I explained and stated this to MO Kelly, and after making that statement MO Kelly stated / asked if Det. Guy gave me permission to search the room. I thought

at this time MO Kelly was trying to clarify what I had just said regarding my phone conversation with Det. Guy. I stated "yes" Det. Guy told me I could search the room after obtaining consent. After hanging up the phone with Det. Guy on 12/13/2011, I told Mr. Petters that I was going to go back to room #417 and as for consent to sit down and talk to Ms. Ellers. Again, I was not told what the complaint was or who the complainant was. I was confused and I told this to MO Kelly. I was unsure on what action that I conducted on 12/13/2011 that violated any policy or constitutional rights. I believed that I was being questioned for failure to search when I smelled the odor of marijuana and I can remember concentrating on that instance and explaining to MO Kelly that I did not feel comfortable addressing that issue when I was there assisting housing with their search for the Merrymonk chairs.

\*\*\* During my conversation with MO Kelly on 12/16/2011, I did not feel the conversation flowed well and that the conversation was inconsistent and sporadic. I had never worked with MO Kelly before and he was recently assigned to our squad. I realized that I had some communications with him prior to this conversation in which MO Kelly did not understand what I was asking. MO Kelly even stated to me that he recognized that we were having a communication barrier and stated that he would do his best to communicate in a way where we were on the same page.

In the middle of our conversation on 12/16/2011, MO Kelly received a phone call on his cell phone and stated to me that he had to leave for a meeting. ( Master Officer Kelly was going through the promotional assessment for the Lieutenant position). Before leaving the officer he asked me if I was okay and I responded "no". It was during this time that MO Kelly asked me to provide him a written statement. MO Kelly did NOT state what he wanted in the statement. His words to me were to give him a "statement". I did not talk again with MO Kelly on that day and he never called me back in to talk to him again to clarify any issues or to confirm or make sure he understood the account of events.\*\*\*\*

Due to how my conversation with MO Kelly was left, I was left with more questions and concerns than anything else. I approached MO Kelly and expressed my concern regarding a written statement and again I mentioned and told him that this sounded "formal" and I asked again if IA was involved. MO Kelly again stated that I was not under an internal affairs investigation and explained to me that he needed my statement so that when

he was talking to someone else and he needed to remember what I had said, he could refer back to my statement. He told me it was for his own purpose. Again, before submitting the statement I requested to speak to MO Kelly in his office. I then asked him and stated that I wanted to "clarify" his intent on what he was looking for from me. I asked him, "do you want me to give you a statement on my initial entry into the room with housing" and MO Kelly responded "yes". I then replied, "okay, then my statement will be the entry with housing only and nothing else". I then exited the Sgt's office and left the station. I wrote my statement in my patrol car in-between calls.

I submitted my statement to MO Kelly and before leaving on Sunday 12/18/2011. I drove to the station and placed my written statement on the chair in the Sgt's office. I left and was dispatched to a call at Wood Hall to assist with housing to help a student obtain his luggage to leave for Christmas break. I was at Wood Hall when MO Kelly called me over the radio and requested for me to respond to the station when I was clear. Upon clearing my call, I responded to the station. I entered the sallyport entrance and upon entering the squad room, I saw Senior Officer Josh Talley sitting at the computer. I walked around the corner and met MO Kelly as he was entering the squad room. He immediately told me I was free to go home when he saw me. I was a little confused and stated to him that I thought he was calling me to the station because he received my written statement. MO Kelly then stated that he had received my statement. I then asked MO Kelly if he had any questions or if he wanted to go over it with me. MO Kelly stated "no" and stated that he had not even read it yet. He told me that I was free to leave and go home.

I need to clarify and state here that I never stated that I had permission to enter and search a dorm room by Sgt. Davis or Det. Guy. I do not even remember talking to Sgt. Davis upon arriving at North Hall or during my encounter and time spent at North Hall on 12/13/2011. I remember talking to Det. Guy and I remember Det. Guy asking why I did not search the room upon smelling the odor of marijuana upon my initial entry into the room with housing and that he stated that I would be able to search the room if Ms. Ellers gave me her consent.

I also need to clarify during my conversation with MO Kelly on 12/16/2011, he states that I told him that housing requested my assistance with an "Administrative Search". I never said this, my explanation was that the Asst. Director of housing, Andy Petters, stated to me that they were missing

2 chairs from the Merrymonk Lounge and had asked me if I wanted to go along with him and Ms. Bailey to see if those chairs were in room #417. I believe that MO Kelly then interpreted that on his own as an "Administrative search". ** I explained that I did not search the room when I entered with Mr. Petters and Ms. Bailey. I stated that I stood by the door and had a polite conversation with Ms. Ellers, stating that I liked her fish and that she had a nice floral type object on her desk. I never touched or opened anything. I did see a license plate hanging above the desk and wrote down the tag number. I never took any law enforcement action while inside the dorm room and only stood by while housing conducted their check for the missing chairs.

** Initially I did not remember MO Kelly telling me that I could have violated anyone's Constitutional rights. I remembered MO Kelly telling me that he needs to make sure that I did not violate a NCSU policy and that it was his job to make sure I was following policy regarding my entry into the student's room. **

After going over the conversation in my head several times, I can now remember MO Kelly mentioning he believed I may have violated Constitutional rights, because at this time I became defensive and I told MO Kelly that I know the law and laws surrounding search and seizure. I can remember again asking MO Kelly who the complainant was and what the complaint was that was against me. He refused to tell me and stated that I did not have a right to know and that it was just something he was investigating.

Upon realizing that MO Kelly misunderstood what I had told him or did not hear everything that I had said, I immediately pointed that out to him upon the conversation in the IA Office. I told MO Kelly that Det. Guy and Sgt. Davis NEVER gave me sole permission to enter anyone's room and that if they had given me permission, I would be asking why they were not held responsible. I further stated that I am well aware that I cannot make entry into anyone's room without a warrant, consent, or upon being asked by housing. I explained that I believed that I did not conduct a search upon the initial entry into the room with housing and MO Kelly told me that I should have known better. He stated to me that I knew there was possible stolen license plates in the room, etc and he told me that I was entering the room with the intention to search for those plates, even when I told him that is not what I was doing, thinking or acting. I did agree with MO Kelly in that if I

did see a license plate on the wall in plain view that I was going to write the tag number down, since I had prior information from the other room occupant that her roommate possibly had stolen property. MO Kelly asked me why Mr. Petters asked me to accompany him to the room. I believe Mr. Petters may have believed that he was helping me or the situation by looking for the chairs and allowing me to come along. I did not want Ms. Ellers thinking I was there because of the license plate and after exiting the room, I had asked Mr. Petters how I did and if I came across as if I were looking for something and Mr. Petters stated that he believed I did a great job. I then asked Mr. Petters since I was there and since they had conducted a search for the missing chairs in room 417 that I would assist and stand by while they searched for the missing chairs in the other rooms located to the east of room #417, since Mr. Petters had mentioned that they were conducting checks of all rooms at North Hall. Mr. Petters stated that would be great and I stood by while Ms. Bailey walked into the other rooms with permission of the occupant and searched the room. I then ran the license plate while standing outside on the balcony and was advised by ECC that the plate did not come back as stolen.

Mr. Petters, Ms. Bailey and I walked down to the parking lot. At this time, I saw Ms. Ellers car parked in front of North Hall. I walked around the car and looked inside and could see a license plate sticking out from underneath the driver's seat. I contacted dispatch and requested to see if they could run a "partial" tag. I believe at this time I received a phone call from Det. Guy or I may have called Det. Guy ( I cannot remember). I explained to Det. Guy the circumstances on what was going on and how I had entered the room with housing and that I had smelled the odor of marijuana upon standing in the room. At this point, Det. Guy asked me what I didn't search the room at that point, since I had probable cause to search with the odor of marijuana. At this time I felt bad and I can remember feeling like I had let Det. Guy down by not searching when he felt I had probable cause. I explained to Det. Guy that I didn't feel it was right to search at that time because I was assisting housing. Det. Guy then stated that I could only search now if I had received consent and that is when I hung up with Det. Guy and explained to Mr. Petters that I was going to go back up to Ms. Ellers room and make contact. I went back up to the room and knocked on the door. Ms. Ellers answered the door and I introduced myself and asked permission to come in and talk with her. Ms. Ellers stated, "yes" and gave me permission to enter her room to talk. Mr. Petters and Ms. Bailey were both present at this time.

( I apologize if my recollection of events regarding this incident are not fresh or detailed, but I was not questioned until 12/16. And on that date I did not give the full account of what had happened on 12/13 due to MO Kelly having to leave for a meeting. I was not questioned again until 1/1/2012)

Upon entering Ms. Ellers room, I explained why I was there and told her that her roommate, Ms. Maslack was enroute to move out tonight. Ms. Ellers began to cry and become emotional and stated that she did not know why her best friend was moving out. I could still smell the odor of marijuana and at that point I had asked Ms. Ellers if she had been smoking marijuana or if she had any marijuana in the room. Ms. Ellers stated that the smell comes from a vent in their bathroom and she gave me verbal consent to search her room. I then asked where her property was and I then searched some prescription pill bottles, an Advil (I believe) bottle on her desk, an eyeglass case and her desk drawer. I stopped my search and explained that I was more concerned with the black book. I then asked Ms. Ellers if she owned a black book and if she knew anything about a black book with names it in of people she wanted to "kill". Ms. Ellers stated that she did not own a black book and she gave me verbal consent to search her book bag or whatever else that I wanted to. I did not search at that time. I was talking to Ms. Ellers about her relationship with Ms. Maslack. I then asked Ms. Ellers about the license plate above her desk and the one I saw in her car. Ms. Ellers stated that they were not stolen and that she would let me search her car if I wanted to. I then walked down to the parking lot with Ms. Ellers, Mr. Petters and Ms. Bailey. I searched her car and ran the license plate that I found under the driver's seat. The license plate did not come back stolen. I made contact with Ms. Maslack and confirmed she was enroute to the school with her parents. Ms. Maslack gave me a name of a friend that knew about the black book. I then walked with Ms. Ellers back up to her room and called the friend that Ms. Maslack had told me about. The phone number was not the correct number, and Ms. Ellers gave me the correct number. I had a conversation with Mr. Wifredo. I then asked Ms. Ellers if she wanted to drive to the station to answer some more questions. I explained to her that she was free to leave at any time and she stated that she wanted to ride with me. ( Ms. Bailey was present at this time).

I drove Ms. Ellers to the station, asked her the necessary risk assessment questions in the presence of Sgt. Bentley, and drove Ms. Ellers back to North Hall. SO Michaelson was going to stand by while Ms. Maslack moved her things out of the dorm room and Ms. Ellers stated she would wait until Ms. Maslack was completely moved out.

** On the evening of 1/1/2012, MO Kelly asked me to return back to the station after talking with me in the Internal Affairs office. When I returned he told me to turn in my shotgun and taser and that the Chief wanted to meet with me. I followed MO Kelly to the Chief's conference room and sat down. Chief Moorman entered the room and told me that no one like's to do these kind of things and further told me that I was being placed on Administrative Leave with pay and to surrender my gun and badge. I immediately told the Chief that this was a mistake and I tried to explain the circumstances to the Chief. When the Chief was asking me questions I believed he was trying to understand and clarify everything. But then the Chief told me that I was being contradictory and deceptive when I attempted to explain the situation. I was confused at this moment and I asked the Chief how I was being deceptive. Chief Moorman then stated that because I said that I did not conduct a search and then said that I did conduct a search that was being untruthful and deceptive. Again I tried to explain that what I was trying to get across was the truth regarding the whole situation and that when I initially entered the dorm room that I did not conduct a search and that it was only the second time that I entered the dorm room that I conducted a search. I explained to the Chief as best as I could that I didn't want him to misunderstand, and that I did not search the room upon my initial entry into the room, but that I did conduct a search upon my second entry. At this point the Chief stated to me, "Allyson did you look around the room with your eyes upon your initial entry into the dorm room"? I responded "yes" to the Chief and he stated to me ...."well then that's a search". I then tried to tell the Chief what MO Kelly had told me when I had asked him why he was so abrupt with me on 12/16/2011, and that MO Kelly had told me that he was distracted and his mind wasn't in the right place. The Chief interrupted me and told me that he didn't care what MO Kelly's mindset was. At this point, I felt that it did not matter what I had to say. I then asked the Chief if after their investigation that they realize that what I have been saying is the truth then what happens... Chief Moorman then

responded by saying, then I would be exonerated. I stated okay and that I look forward to that. Chief Moorman then stated to me that that was not going to happen. He stated that when he takes my gun and badge that he feels confident that he can prove the allegations against me and that he would see my in my pre-termination hearing. I was devastated and could not say anything else. I was escorted to the door by MO Kelly and while walking to the door, MO Kelly stated to me, "Allyson, it's going to be okay, we'll get through this".